## IN THE *UNITED* STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| MARSHALL SHANKLIN, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-07-2690 |
| | § | |
| COLUMBIA MANAGEMENT | § | |
| ADVISORS, L.L.C., | § | |
| | § | |
| Defendants. | § | |

### MEMORANDUM AND ORDER

The plaintiff, Marshall Shanklin, has sued his former employer, Columbia Management Advisors, L.L.C. ("CMA"), a business unit of the Bank of America. Shanklin worked at CMA as a sales representative marketing investment products beginning in April 2005. CMA terminated Shanklin's employment for cause on November 21, 2006. In this suit, Shanklin alleges that CMA owes him incentive bonus payments for investment products that he sold before he was fired. Shanklin asserts that the failure to pay the incentive bonuses breached his contract with CMA. Alternatively, he asserts a *quantum meruit* claim. Shanklin also alleges that CMA defamed him in an explanation for his job termination contained in a filing required under industry regulations. (Docket Entry No. 14). Shanklin moved for partial summary judgment on the meaning of the documents describing CMA's incentive compensation plan. Specifically, Shanklin moved for partial summary judgment that, as a matter of law, his dismissal for cause did not "forfeit or otherwise affect his right to

commission payments due under the 2005 and 2006 incentive plans" and that "his right to receive a commission under those plans vested when he won a commitment for the purchase of a product." (Docket Entry No. 23 at 6). CMA moved for summary judgment dismissing all Shanklin's claims. (Docket Entry No. 26). CMA also moved to exclude the testimony of an expert witness. (Docket Entry No. 24).

Based on a careful review of the pleadings, the motions, the responses, and the applicable law, this court denies Shanklin's motion for partial summary judgment and grants in part and denies in part CMA's motion for summary judgment. Specifically, the claim for breach of contract remains as to the bonus payments due under the 2006 incentive plan for products that were funded before Shanklin's termination. The claims for breach of contract for bonuses under the 2005 incentive plan and for bonuses under the 2006 plan for products committed but not funded are dismissed, as are the *quantum meruit* and defamation claims. CMA's motion to exclude the expert testimony is denied as moot.

The reasons for these rulings are set out below.

## I.      Background

### A.      Shanklin's Application and CMA's Offer of Employment

Shanklin began work at CMA as a Senior Institutional Sales Representative on April 18, 2005. (Docket Entry No. 26. Ex. A-1, exhibit 22).[1] As part of his employment application, Shanklin signed an "Applicant Acknowledgment Form." This form contained

---

[1] "Ex." refers to an exhibit attached to a court filing. "Exhibit" refers to an exhibit attached to a deposition excerpt that is attached as an exhibit to a court filing.

2

a clause stating:  "If my employment is terminated, I will receive only the salary or wages I have already earned for that time I have worked as of the date of termination of my employment, and nothing more."  (Docket Entry No. 29, Ex. A-1, exhibit 6).

Shanklin received an offer letter from CMA.  The letter stated that Shanklin would receive an annual base salary of $135,000.00 and that he was eligible to participate in the company's Institutional Sales Incentive Compensation Plan (the "Incentive Plan").  The letter stated, in relevant part:

> You will be eligible to participate in the Columbia Management Group (CMG) Institutional Sales Incentive Compensation Plan, *subject to its terms and conditions, as determined by management*.  You will receive a guaranteed incentive payment of $90,000.00, less appropriate taxes for performance year 2005, payable quarterly, with a minimum quarterly floor of $22,500.00. *This quarterly incentive bonus is guaranteed only for the next four quarters*.  This incentive bonus is guaranteed to be paid to you, unless you voluntarily resign from Bank of America's Columbia Management Group, or you give us cause to terminate your employment.  You must be employed with Bank of America's Columbia Management Group at the time payout is awarded.

(Docket Entry No. 26, Ex. A-1, exhibit 2) (emphasis added).  The offer letter also stated that Shanklin would be an at-will employee:

> This letter does not constitute an employment contract, and nothing in this letter or in any other communications you have had with Bank of America representatives should be construed in any way as a guarantee of continued employment for any period of time, but rather your employment is on an at-will basis. . . .

(*Id*.).  The offer letter also defined the grounds for termination for cause:

> For purposes of this letter, "Cause" shall mean: (1) an act of
> fraud or dishonesty in the course of your employment; (2)
> conviction of (or a plea of no contest with respect to) a crime
> constituting a felony; (3) an act or omission which causes you
> or the Company to be in violation of federal or state securities
> laws, rules, or regulations, and/or the rules of any exchange or
> association of which the Company is a member, including
> statutory disqualification; (4) failure to perform your essential
> job duties under circumstances where such failure is injurious to
> the Company, its business interests or its reputation; (5) your
> material breach of any written policy applicable to employees of
> the Company including, but not limited to, the Bank of America
> Corporation Code of Ethics and General Policy on Insider
> Trading; or (6) your material violation of the Company's written
> Confidentiality Agreement . . . .

(*Id.*)  Shanklin signed this offer letter.  (*Id.*)

## B.    The Incentive Plan and Shanklin's Incentive Payments

Shanklin earned the guaranteed minimum bonus during the first four quarters of his employment with CMA.  (Docket Entry No. 23 at 4; Ex. 2 at 94:11-25).  Shanklin admits that he did not generate sufficient sales during those first four quarters to earn a bonus above the guaranteed minimum.  (*Id.*).  After the first four quarters, Shanklin was no longer guaranteed a minimum bonus but continued to be eligible to participate in the Incentive Plan.

CMA has submitted a copy of what it identifies as the 2006 Institutional Sales Incentive Compensation Plan (the "2006 Incentive Plan").  This document stated that "[p]articipants who terminate for any reason other than reduction in work force, retirement, disability or death, will not receive sales incentive payments beyond their last day of work unless they are active employees at the time the award is paid."  (Docket Entry No. 26, Ex. A-1, exhibit 9 at 2).  The 2006 Incentive Plan also stated that "participants whose

4

employment is terminated (either by Bank of America or the participant) prior to determination, payment, or receipt of an incentive award will generally not be eligible to receive an award." (*Id.* ¶ 2). The 2006 Incentive Plan made clear that no employment or other type of contract was created:

> This plan may be modified or discontinued at any time with or without notice at the discretion of management. Participation in the plan cannot be construed to constitute a contract of employment or otherwise between Bank of America Corporation, Bank of America, N.A., and/or its or their subsidiaries or affiliates and any of its associates. Plan participation does not limit Bank of America from terminating the employment of a participant at any time, with or without cause or notice. . . .

(*Id.* ¶ 12). The 2006 Incentive Plan document did not contain information about how incentive bonuses for long-term investment products would be determined or when they would be payable. It contained several typographical errors and was not signed.

Shanklin testified in his deposition that he did not recall seeing the 2006 Incentive Plan document. He conceded that if the document was posted on CMA's internal website, he would have had access to it. (Docket Entry No. 29, Ex. A-1 at 109:1-11). Shanklin asserts that there is no evidence that the 2006 Incentive Plan document was made available to him. He argues that he did not know that there were terms and conditions for the 2006 Incentive Plan other than those contained in the 2006 Plan Component Summary Sheet ("2006 Plan Summary Sheet"). The 2006 Plan Summary Sheet was distributed to employees, who were asked to read and sign the document. The copy signed by Shanklin is part of the summary judgment evidence.

Shanklin disputes the authenticity of the 2006 Incentive Plan document produced by CMA and asks that it be disregarded as a fabrication or as an unpublished draft. (Docket Entry No. 23 at 15-16; No. 30 at 8-10). CMA vigorously disputes that the 2006 Incentive Plan document was fabricated. John Scuzzarella, a Compensation Manager for the Bank of America in the Finance Department in Boston, executed an affidavit stating that the 2006 Incentive Plan document and the 2006 Summary Sheet "together created the compensation structure for Institutional Sales Representatives in 2006," and that the 2006 Sales Incentive Compensation Plan document was a "true and accurate copy." (Docket Entry No. 32, Ex. 2). The record, however, contains no evidence supporting the assertion that the 2006 Incentive Plan document was circulated to employees or posted on CMA's internal website.

Shanklin does recall receiving, reading, and signing the 2006 Plan Summary Sheet. The 2006 Plan Summary Sheet stated that it provided a "complete explanation" of the 2006 Incentive Plan. The Summary Sheet set out the formula for calculating the bonus amounts payable to sales representatives for selling different CMA financial products. One product category was "long-term" products such as mutual funds and separate accounts. These were Shanklin's focus at CMA. The 2006 Plan Summary Sheet stated that incentive bonuses for long-term products would be paid "12 quarters from funding quarter date." The formula was 23% of the sales revenue from the product for quarters one through four, 7% of the sales revenue for quarters five through eight, and another 7% for quarters nine through twelve. (Docket Entry No. 26, Ex. A-1, exhibit 5). The evidence showed that CMA's policy was to start incentive bonus payments sixty days after the end of the quarter in which the sale of the

long-term product funded.  (*Id.*, Ex. A-3 at 45:9-20).  The payments would be made for "12 quarters from [the] funding quarter date," but there would be "no continued payout if [the] account falls off book."  (*Id.*, Ex. A-1, exhibit 5).

CMA had followed a similar incentive bonus policy in 2005 but had not reduced the policy to a written plan document or a summary.  Under the 2005 plan, CMA paid incentive bonuses for product sales over eight quarters, with a payment of 26.5% of sales revenues for the first four quarters and a 7% payout for the remaining four quarters.  (*Id.*, Ex. A-4, at 3-4).

Sales representatives were required to sign the 2006 Plan Summary Sheet.  The reason was set out in that document:

> The Compensation Plan Component Summary Sheet has been provided to ensure that you have a *complete explanation* of the CMG Institutional Distribution Incentive Plan for 2006.  It is important that you read the Compensation Plan Component Summary Sheet carefully.  We ask that you sign below in the space provided indicating that you have read the *contents of each document*.

(*Id.*, Ex. A-1, exhibit 5) (emphasis added).  Shanklin signed on February 2, 2006.  (*Id.*). Shanklin asserts that the 2006 Plan Summary Sheet should be read independently of the 2006 Incentive Plan document, the authenticity of which he challenges.  CMA responds that both documents must be read together, noting that the 2006 Plan Summary Sheet refers to the CMG Institutional Distribution Incentive Plan for 2006 and refers to the "contents of each document."

When CMA discharged Shanklin, he had obtained both commitments and funding for seven long-term payment accounts in 2006.  He had obtained commitments, but not funding,

7

for three other accounts. (Docket Entry No. 23 at 6-7, Ex. 4, exhibit 6 at MS0447-0449). CMA has submitted Compensation Summary Sheets for Shanklin showing his incentive bonus compensation for 2005 and 2006. CMA asserts that these sheets show that Shanklin was paid all the incentive bonus payments he was owed through his termination for cause. (Docket Entry No. 26 at 4; Ex. A-3, exhibits 4, 5). The parties dispute whether Shanklin was entitled to continued bonus payments after his job termination under the 2005 or 2006 plans. The parties also dispute whether Shanklin was entitled to bonus payments for accounts that were committed, but not funded, when his employment was terminated.

### C.    The Termination of Shanklin's Employment

CMA terminated Shanklin's employment, for cause, on November 21, 2006. The decision was made after Shanklin's repeated failure to follow an internal policy for recording gifts, hospitality, and entertainment given to or received from clients and suppliers. This policy, which CMA referred to as the "GE Policy," was implemented in May 2006. (*Id.*, Ex. A-5 at 24:22-25:8). Its purpose was to avoid "real or apparent conflict[s] of interest" by imposing strict recordkeeping and disclosure requirements for gifts and entertainment received from clients and suppliers. (*Id.*, Ex. A-6, exhibit 8 at 1). These requirements were designed to help CMA managers comply with the NASD's rules on supervising registered representatives. (Docket Entry No. 30, Ex. 3 at 38:8-21). The GE Policy was also designed to ensure that CMA sales representatives complied with "federal, state and municipal restrictions regarding entertainment and gifts to government officials." (Docket Entry No. 26, Ex. A-6, exhibit 8 at 2).

The GE Policy required that sales representatives report gifts and entertainment given to clients and suppliers in expense reports and in a separate "tracking log" listing such gifts and entertainment. (*Id.*, Ex. A-6, exhibit 8 at 19-20; Ex. A-7 at 120:10-21). The "Frequently Asked Questions" section of the GE Policy emphasized that sales representatives had to list gifts and entertainment in the tracking log, even if the gifts and entertainment were already included in expense reports. The section stated:

> Q: I already report my gifts and entertainment in the Bank's Travel & Expenses report, as well as in my LOB-specific reports. Do I have to record these items in the Tracking Log as well?
>
> A: Yes. The recording of gifts and entertainment in the Tracking Log, or LOB-centralized system that feeds into the Tracking Log, is mandatory and supplemental to LOB-specific and T&E processes. However, the next phase of the GWIM Gifts & Entertainment Tracking program will focus on minimizing the duplication of data entry.

(*Id.*, Ex. A-6, exhibit 8 at 19-20).

Shanklin was emailed a copy of the GE Policy, along with a reminder to update his tracking log, on May 31, 2006. (*Id.*, Ex. A-1, exhibit 12 at MS1329). Shanklin replied on June 6, 2006 that he "had no expenses where this policy would apply." (*Id.* at MS1328). On June 19, 2006, Shanklin spoke by phone with Christopher Horgan, CMA's Managing Director of Institutional Sales. Horgan told Shanklin that his "current [recording] method raise[d] non-compliant flags" in CMA's tracking system. (*Id.* at MS1322). Shanklin's expense report showed $4,779 spent on customer entertainment for the year, but his tracking record showed there were no entries for entertainment. (*Id.* at MS1321).

9

Shanklin and Horgan again discussed Shanklin's failure to comply with the tracking log requirement of the GE Policy on August 7, 2006.  (*Id*. at MS1322).  On September 5, 2006, Shanklin received another email reminder to update his tracking log.  Shanklin replied the same day that he had nothing to report on the tracking log.  (*Id*. at MS1326).

On August 11, 2006 CMA sales representatives received email notification of a mandatory training session on CMA's Institutional Policies and Procedures.  The session included instruction on the tracking log requirement.  Shanklin missed scheduled sessions but attended a make-up session on September 28, 2006.  (*Id.*, Ex. A-5, exhibit 2 at MS1493-94).  A PowerPoint presentation given at the session discussed the need to complete and update the tracking log.  (*Id*. at MS1505).  Shanklin confirmed on September 29, 2006 that he had read and understood CMA's Institutional Policies and Procedures.  (*Id*., Ex. A-1, exhibit 18).  Nevertheless, in October 2006, Shanklin's expense report included $10,382.97 in customer entertainment expenses for 2006, none of which were documented on his tracking log.  (*Id*., Ex. A-1, exhibit 12 at MS1325; Ex. A-7 at 96:13-23).

In late September 2006, Amy Roberts, a CMA Business Support Executive tasked with reviewing the tracking logs, discovered that Shanklin had incurred significant customer entertainment expenses in 2006 despite stating each month that he had nothing to report on the tracking log.  (*Id*., Ex. A-7 at 96:13-23).  In October and November 2006, Roberts and Shanklin had a "series of conversations" about Shanklin's failure to comply with his recordkeeping obligations.  (*Id*., Ex. A-7, at 96:12-23, 107:5-109:22).  Roberts testified in her deposition that she and Shanklin "discussed the policy and the fact that even though he

10

was submitting his T&E, there was still a separate requirement that he submit his gift and entertainment log.  And we acknowledged that it was a duplicative exercise, but that he needed to do both pieces." (*Id.*, Ex. A-7, at 124:19-24).  On November 9, 2006, Shanklin wrote in response to an email from Roberts that "[l]ast time this was discussed I did not understand it applied to lunches, dinners, and golf.  I will get it taken care of." (*Id.*, Ex. A-1, exhibit 20).

In November 2006, CMA senior managers, concerned about Shanklin's persistent noncompliance with the GE Policy, decided that he had to attend a meeting at CMA's Boston office to discuss the issue.  Susan Hannon, a Human Resources Manager at CMA, contacted Shanklin on November 17, 2006 to schedule the meeting.  During that conversation, Shanklin reiterated that he had nothing to report, stating that all the relevant information was in his expense reports. (*Id.*, Ex. A-1 at 158:1-17).  On November 20, 2006, Shanklin arrived at the Boston meeting without having completed his tracking log.  He again insisted that he had nothing to report on the tracking log because the information was in his expense reports. (*Id.* Ex. A-1 at 159:12-160:21; Ex. A-7 at 147:2-18).  Roberts, who attended the meeting, testified that Shanklin arrived with a "fairly disorganized collection of receipts," and that "he didn't have the calendar information that would have supported the entertainment and the details that needed to be put under the gift log.  He had the receipts.  He didn't have anything that corresponded in terms of crossing that to his calling activity." (*Id.*, Ex. A-7 at 147:19-148:20).  Roberts testified that after the meeting, she "didn't have an expectation that [Shanklin] would complete the log." (*Id.* at 148:5-12).

After leaving the meeting, Shanklin called his secretary for confirmation that he "really ha[d] to duplicate this stuff." (*Id.*, Ex. A-1 at 164:5-8).  He also emailed her, asking: "[w]hat do you report on this.  Is it all customer lunches, dinners, golf etc.  Or is it just tickets, gifts." (*Id.*, Ex. A-9).  He also emailed his supervisor, William Moffly, stating, "I have not been doing it right.  Just found out just got out of meeting with Sue Hannon.  I thought you just but [sic] items not identified on expense report like tickets when you are not there and gifts." (*Id.*)

After the meeting, CMA's senior managers concluded that Shanklin was unlikely to complete his tracking log as required.  On November 21, 2006, Shanklin's employment was terminated for cause.  The reason given was his failure to comply with the GE Policy.  (*Id.*, Ex. A-6 at 127:11-16).

CMA was required to file a Uniform Termination Notice for Securities Industry Registration ("Form U-5") in connection with Shanklin's termination.  On that form, CMA was required to state its reason for Shanklin's termination.  (*Id.*, Ex. A-5 at 104:9-25).  CMA reported that Shanklin was terminated for "Internal Policy Violation; Non-Securities Related."  (*Id.*, Ex. A-1, exhibit 22).

**D.    Shanklin's Claims**

In this suit, Shanklin seeks posttermination incentive bonus payments on the basis of contractual obligation or *quantum meruit*.  He also seeks damages for defamation arising from CMA's statement in the Form U-5 of the reason for terminating his employment.  After discovery, Shanklin moved for partial summary judgment that the documents relating to the

2006 Incentive Plan created a contractual obligation on the part of CMA to continue to pay him a quarterly bonus after his employment ended.  Shanklin also moved for partial summary judgment that the bonuses were due not only for long-term product sales that had been funded during his employment but also for sales that were committed but not funded when he was discharged.  CMA filed a motion for summary judgment as to all Shanklin's claims.  The motions and responses are addressed below.

## II.    The Summary Judgment Standard

Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law.  FED. R. CIV. P. 56.  The movant bears the burden of identifying those portions of the record it believes demonstrate the absence of a genuine issue of material fact.  *Lincoln Gen. Ins. Co. v. Reyna*, 401 F.3d 347, 349 (5th Cir. 2005) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)).

If the burden of proof lies with the nonmoving party, the movant may either (1) submit evidentiary documents that negate the existence of some material element of the opponent's claim or defense, or (2) if the crucial issue is one on which the opponent will bear the ultimate burden of proof at trial, demonstrate that the evidence in the record insufficiently supports the essential element or claim.  *Celotex*, 477 U.S. at 330.  While the party moving for summary judgment must demonstrate the absence of a genuine issue of material fact, it does not need to negate the elements of the nonmovant's case.  *Boudreaux v. Swift Transp. Co., Inc.*, 402 F.3d 536, 540 (5th Cir. 2005).  "An issue is material if its resolution could

13

affect the outcome of the action." *DIRECTV, Inc. v. Robson*, 420 F.3d 532, 536 (5th Cir.

2005) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d

202 (1986)).  If the moving party fails to meet its initial burden, the motion for summary

judgment must be denied, regardless of the nonmovant's response.  *Baton Rouge Oil &*

*Chem. Workers Union v. ExxonMobil Corp.*, 289 F.3d 373, 375 (5th Cir. 2002).  When the

moving party has met its Rule 56(c) burden, the nonmoving party cannot survive a summary

judgment motion by resting on the pleading allegations.  The nonmovant must identify

specific evidence in the record and articulate the manner in which that evidence supports that

party's claim.  *Johnson v. Deep E. Texas Reg'l Narcotics Trafficking Task Force*, 279 F.3d

283, 305 (5th Cir. 2004).  This burden is not satisfied by "some metaphysical doubt as to the

material facts, conclusory allegations, unsubstantiated assertions, or only a scintilla of

evidence."  *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1076 (5th Cir. 1994).  In deciding a

summary judgment motion, the court draws all reasonable inferences in the light most

favorable to the nonmoving party.  *Anderson*, 477 U.S. at 255.

## III.    The Breach of Contract Claim

Shanklin argues that the 2006 Plan Summary Sheet created a contract for CMA to pay

him posttermination incentive bonus payments on sales that were either funded or committed

before his employment was terminated in November 2006.  Shanklin acknowledges that the

2006 Plan Summary Sheet stated that bonus payments would not begin until the sale was

"funded," that is, until CMA had received the funds, not merely a commitment, from the

client.  He also acknowledges that the 2006 Incentive Plan document states that it does not

14

create a contract, and that CMA generally would not pay posttermination incentive bonuses. Shanklin argues that the 2006 Incentive Plan document has not been authenticated and that even if it was authentic, it does not alter the terms of the 2006 Plan Summary Sheet.  He asserts that the 2006 Plan Summary Sheet is complete on its face, reflects the parties' entire understanding, and is an enforceable contract that entitles him to posttermination bonus payments on product sales made before he was fired.  CMA counters that the 2006 Incentive Plan document has been authenticated, that its terms govern, and that the 2006 Plan Summary Sheet is not a contract to pay Shanklin posttermination bonus payments.

**A.     The 2006 Incentive Plan Document**

If the 2006 Incentive Plan document is considered with the 2006 Plan Summary Sheet as forming the terms and conditions of the 2006 Incentive Plan, Shanklin is not entitled to receive any posttermination bonus payments.  The 2006 Incentive Plan document makes clear that participants whose employment is terminated before the "determination, payment or receipt of an incentive award" will generally not be eligible for the award.  The document also makes clear management's discretion to change or discontinue the 2006 Incentive Plan at any time. Finally, the document makes clear the absence of any intent to give rise to contractual rights.

Shanklin argues that the 2006 Incentive Plan document has not been authenticated. He points to the facts that it is not dated, does not contain a formula to calculate the 2006 bonuses, is not signed despite having signature lines for three executives, has one paragraph (16) that is largely duplicative of two other paragraphs (10 and 11), and contains

15

typographical errors (spelling "Bank of America" with a lower-case "b" and stating "there line of business" rather than "their line of business").  Shanklin argues that the document appears to be either fabricated or an unfinished draft.  Shanklin also cites the deposition testimony of Jonathan Cleasby, part of the Bank of America team that administered the 2006 Incentive Plan, stating that he did not recall seeing the 2006 Incentive Plan document and did not know whether it had been distributed to employees.  (Docket Entry No. 30 at 3).

CMA counters that Shanklin takes Cleasby's testimony out of context.  (Docket Entry No. 32 at 3-4).  Cleasby testified that he joined CMA in November 2005.  Although he helped draft the 2006 Plan Summary Sheet, he played only a limited role in formulating the 2006 Incentive Plan itself.  The compensation group (of which he was not a member) had primary responsibility for the 2006 Incentive Plan.  Cleasby testified that he "may have been on a call when components of the plan were discussed and general instructions or guidelines laid out," but he "d[idn't] recall being involved in any really substantive and specific conversations about a component versus another."  (Docket Entry No. 32, Ex. 1-A at 17:19-21, 77:1-6).  Cleasby testified that the 2006 Plan Summary Sheet did not represent the entirety of the 2006 Incentive Plan.  If Cleasby had additional questions about the plan, he would refer to "[t]he official plan documents . . . that are held by the compensation group."  Cleasby identified John Scuzzarella, a compensation manager at Bank of America, as a member of the compensation group who would have more complete knowledge of the 2006 Incentive Plan's terms.  (*Id*. at 94:7-22).

CMA has submitted a declaration from John Scuzzarella that attests to the authenticity of the 2006 Incentive Plan document.  In his declaration, Scuzzarella explains that during the relevant time, he was a Vice President and Finance Business Support Manager for CMA, "responsible for administering the compensation plans applicable to all sales representatives employed by CMA."  The declaration states that "[d]uring 2006, all eligible employees were compensated for their sales performance in accordance with the terms of the [2006 Incentive Plan] in conjunction with the [2006 Plan Summary Sheet].  The Plan and the 2006 Plan Summary Sheet together created the compensation structure for Institutional Sales Representatives in 2006."  In the declaration, Scuzzarella also affirms under penalty of perjury that the document at issue is a "true and accurate cop[y]" of the 2006 Incentive Plan. (Docket Entry No. 32, Ex. 2).

Federal Rule of Evidence 901 states that "[t]he requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims."  FED. R. EVID. 901(a).  Testimony by a "witness with knowledge" that "a matter is what it is claimed to be" is sufficient for authentication.  FED. R. EVID. 901(b)(1).

The record provides a sufficient predicate to authenticate the 2006 Incentive Plan document.  CMA has submitted competent summary judgment evidence of authenticity, including Scuzzarella's declaration, (*id.*); Cleasby's deposition testimony about the document, (*id.*, Ex. 1 at 94:12-22); and the express reference to the 2006 Incentive Plan in the 2006 Plan Summary Sheet, (Docket Entry No. 26, Ex. A-1, exhibit 5).  *See McIntosh v.*

17

*Partridge*, 540 F.3d 315, 322 n. 6 (5th Cir. 2008) (sworn declaration of individual personally familiar with facts contained in document sufficient for authentication); *TIP Sys., LLC v. SBC Operations, Inc.*, 536 F. Supp. 2d 745, 751, n. 1 (S.D. Tex. 2008) (same). When "the proponent has made the requisite showing, the trial court should admit the exhibit . . . in spite of any issues the opponent has raised about flaws in the authentication. Such flaws go to the weight of the evidence instead of its admissibility." 5 WEINSTEIN'S FEDERAL EVIDENCE § 901.02[3] (2d ed. 2005); *see also United States v. Wake*, 948 F.2d 1422, 1435 (5th Cir. 1991). Shanklin's arguments that the 2006 Incentive Plan document has not properly been authenticated go to the weight the document should be given by the trier of fact.

Although the 2006 Incentive Plan document submitted by CMA is authenticated and is competent summary judgment evidence, there are questions as to what weight it deserves. Moreover, the record does not establish that the 2006 Incentive Plan document submitted by CMA was distributed to employees with the 2006 Plan Summary Sheet or was otherwise made available to employees. Shanklin asserts that there is no evidence that he ever received or saw the 2006 Incentive Plan document and argues that the 2006 Plan Summary Sheet was presented as the written 2006 Incentive Plan. He points out that although the 2006 Plan Summary Sheet refers to the 2006 Incentive Plan, the Summary Sheet states that it is a "complete explanation" of the 2006 Incentive Plan – a fact that he claims led him to believe that he did not need to refer any other document and that there were no additional plan terms. (Docket Entry No. 26, Ex. A-1, exhibit 5). The only evidence in the record that Shanklin might have received a copy of the 2006 Incentive Plan document is Shanklin's testimony that

18

he had access to CMA's internal website where policies such as the plan were supposed to be posted.  (Docket Entry No. 29, Ex. 1 at 109:1-11).  CMA has not submitted or identified evidence that the 2006 Incentive Plan document was distributed to employees or was made available to employees on the company's website.  The record does not support the conclusion that employees – including Shanklin – received or had access to the 2006 Incentive Plan document.  The record does not allow the court to conclude that, as a matter of law, the 2006 Incentive Plan document and the 2006 Plan Summary Sheet should be considered together to preclude the contract claim.

*Lone Star Steel Co. v. Scott,* 759 S.W.2d 144, 152 (Tex. App.–Texarkana 1988, writ denied), cited with approval in 33 TEX. JUR. 3d EMPLOYER & EMPLOYEE § 30 (2008), involves similar facts.  In *Lone Star*, the employer had a formal policy that employees whose suggestions for process improvements were implemented would be awarded a bonus.  Under the formal policy, whether to continue or modify the policy and the amount of any bonus award were at management's discretion.  *Id.* at 151.  This formal policy was not distributed to employees.  *Id.*  Instead, the company published a summary of the policy in its manual for new employees and in the company newsletter.  The summary stated, in relevant part:

> Cash awards will be paid for all suggestions adopted.  Awards for suggestions which result in savings to the Company, or greater production or better quality, will be based on a percentage of the savings during the first year the suggested change is in operation.  The minimum award will be $5.  The maximum is governed only by the value of the employee's suggestion, but could amount to thousands of dollars for a valuable idea.

19

*Id*.  The plaintiff employee submitted a suggestion that the employer implemented, resulting in substantial cost savings.  The employer refused to pay a bonus.  In the lawsuit, the employer argued that the discretion provided in the formal policy to modify or discontinue it at any time precluded contract formation.  The court rejected this argument, concluding that the summary constituted a modification of the policy and that the summary itself was a "valid unilateral contract[ ]" that became "binding when accepted and performed by the promissee."  *Id*.; *cf. Haggar Co. v. C.G. Rutkiewicz*, 405 S.W.2d 462, 464-65 (Tex. App.–Waco 1966, writ ref'd n.r.e.) (upholding jury verdict awarding prorated bonus for five months of employment for employee who quit after five months and who claimed not to have been told of the policy that employees must remain with company an entire year to receive a bonus).

In another Texas case, *Lang v. Mbank Dallas*, 756 S.W.2d 811, 813 (Tex. App.–Dallas 1988, no writ), the court considered similar facts.  In *Lang*, the plaintiff's offer letter stated that she would be eligible to participate in the company's incentive plan, earning a bonus on profits generated for the company.  The offer letter was silent on whether bonuses earned but not yet paid would be made after employment ended.  The offer letter referenced in passing, but did not attach, the company's formal incentive plan, which stated that bonus payments would only be made to individuals still employed at the time of disbursement.  *Id*. at 812.  The plaintiff argued that she should not be bound by these plan terms because "she was not put on notice of a formal, documented incentive plan."  The court rejected the

20

plaintiff's argument, concluding that the offer letter was sufficient to inform the plaintiff of the existence of a plan "of which she should learn the specific details." *Id.* at 813.

The Sixth Circuit reached a similar result in *Andries v. Emhart Indus., Inc.*, 944 F.2d 904, 1991 WL 174228, at *3 (6th Cir. Sept. 6, 1991) (unpublished). The defendant employer's formal incentive compensation plan stated that employees would not receive any commissions after termination. The parties agreed that the plaintiff was never shown a copy of the formal policy. The parties further agreed that the plan summary the plaintiff received did not mention that commissions would not be paid after the employment ended. The plaintiff sued for earned commissions unpaid after losing his job during a reorganization. *Id.* at *1. The court concluded that the formal plan terms controlled. Although there was "no evidence" that the plaintiff saw a copy, the plaintiff "d[id] not claim that he was misled as to the contents of the plan or that the company denied him access to it." The court had "no trouble" concluding that the formal plan represented the parties' agreement. *Id.* at *3.

The present case may be distinguishable from *Lang* and *Andries* because the 2006 Plan Summary Sheet stated that it was designed to provide a "complete explanation" of the 2006 Incentive Plan's terms. Shanklin arguably had less notice that there were additional terms than the plaintiffs had in either *Lang* or *Andries*, placing his situation closer to the facts in *Lone Star*. The record is both disputed and inadequate to determine whether Shanklin saw or had access to the 2006 Incentive Plan document. There are disputed fact issues material to determining whether, as a matter of law, the 2006 Incentive Plan document is to be considered with the 2006 Plan Summary Sheet in determining the terms and conditions of

21

the 2006 Incentive Plan or whether the 2006 Plan Summary Sheet must be considered separately.

### B.    The 2006 Plan Summary Sheet

Shanklin moves for partial summary judgment that considered separately, the 2006 Plan Summary Sheet created a contractual obligation for CMA to pay him posttermination bonuses for his pretermination sales of long-term financial products, both funded and merely committed.  CMA moves for summary judgment that even considered apart from the 2006 Incentive Plan document, the 2006 Plan Summary Sheet did not create a contract to pay any posttermination bonus.

### 1.    *The Issue of Discretion to Pay a Bonus*

Under Texas law, "[a] valid and binding contract is formed by: (1) an offer; (2) an acceptance in strict compliance with the terms of the offer; (3) a meeting of the minds; (4) each party's consent to the terms; and (5) execution and delivery of the contract with the intent that it be mutual and binding."  *Vt. Info. Processing, Inc. v. Mont. Beverage Corp.*, 227 S.W.3d 846, 853 (Tex. App.–El Paso 2007, no pet.); *Critchfield v. Smith*, 151 S.W.3d 225, 233 (Tex. App.–Tyler 2004, pet. denied).  A valid contract is not formed in the absence of bargained-for consideration.  *Peterson v. Dean Witter Reynolds, Inc.*, 805 S.W.2d 541, 550 (Tex. App.-Dallas, 1991, no writ).  There is no consideration when the promise at issue is to perform a preexisting duty.  3 WILLISTON ON CONTRACTS § 7:39 (4th ed. 2000).

The traditional view is that when an employment contract does not guarantee a bonus in a fixed, nondiscretionary amount, and the bonus offered is "an incentive to encourage the

employee to perform in accordance with the previously existing contract of employment," the "promise to pay a bonus is unenforceable for want of sufficient consideration, since the employee is only giving the same service it has already contracted with the employer to render." *Id.*; *see also Williams v. Vynckier Enclosure Sys., Inc.*, No. H-04-cv-3223, 2005 WL 2810709, at **10-11 (S.D. Tex. Oct. 27, 2005); *Castranova v. Teknerkron Infoswitch, Inc.,* No. 3:00-cv-0361, 2003 WL 22143793, at *3 (N.D. Tex. Aug. 18, 2003). In *Castranova*, which CMA cites, the plaintiff's initial employment contract provided that he could receive a discretionary bonus each year. One year, the plaintiff – then still an employee – did not receive a bonus, despite being told by a supervisor that he was eligible for a bonus in an unspecified amount that year. 2003 WL 22143793, at *1. The plaintiff asserted that he was entitled to a bonus as part of his compensation because he and the employer had "agreed at the outset of the employment relationship that Plaintiff would work for salary plus bonus and that the work he performed during the year was induced by Defendant's promise to pay the bonus." *Id.* at *2. The court rejected this argument, concluding that "[t]here is no evidence that Defendant promised Plaintiff an annual non-discretionary bonus at the commencement of his employment in exchange for Plaintiff's work performance." *Id.* The court in *Williams* reached the same outcome on a similar set of facts. *See* 2005 WL 2810709, at **10-11.

This case is distinguishable from *Castranova* and *Williams*. Those cases involved employment arrangements under which management had discretion as to whether to give any bonus and in what amount. In this case, the 2006 Plan Summary Sheet sets out a specific formula for calculating incentive bonuses and contains no language stating that the bonuses

for the long-term products were at management's discretion.  The 2006 Plan Summary Sheet states that the "Sales Credit Pool," another part of the Plan, did involve "Management discretion – based on goal achievement and other specified growth performance measurements."  (Docket Entry No. 26, Ex. A-1, exhibit 5).  No such language is attached to the description of the Incentive Payment Calculation for the long-term financial products portion of the Plan.

The March 2005 offer letter from CMA, which Shanklin signed, stated that he would be eligible to participate in the Incentive Plan "subject to its terms and conditions, as determined by management."  (*Id.*, Ex. A-1, exhibit 2).  Shanklin was guaranteed an incentive bonus of a specified amount for the next four quarters.  The 2006 Plan Summary Sheet applied to incentive payments after these guaranteed quarterly payments for 2005.  The 2006 Plan Summary Sheet stated that bonuses would be paid to all representatives over the course of twelve quarters as a percentage on the profits from long-term products sold and funded: a 23% payout in the first four quarters, a 7% payout in the second four quarters, and an additional 7% payout for the last four quarters.  (*Id.*, Ex. A-1, exhibit 5).  The Summary Sheet does not state that management would exercise discretion in awarding bonuses for long-term product sales.

Although a promise to pay a discretionary bonus generally does not create a contract because of failure of consideration, the rule, accepted in Texas, is that "[a]n employer's promise to pay a bonus in contemplation of the employee's exerting extra or additional efforts in his service for the employer's benefit . . . create[s] a valid and enforceable contract

24

once accepted as against the contention of lack of consideration."  43 A.L.R.3d 503 § 8 (2008).  *Toch v. Eric Schuster Corp.*, 490 S.W.2d 618, 624 (Tex. Civ. App. –Dallas 1972, writ ref'd n.r.e.) is instructive.  In *Toch*, the plaintiff's initial employment agreement was silent on whether he would receive any bonus, but the employer later "set up a bonus scale to induce the salesmen to work harder to perform their contracts or as an added incentive to carry out their duties."  490 S.W.2d at 624.  The court held that because "[t]his scale was accepted by the employees, including Toch . . . it can reasonably be said that it constitutes a contract for the payment of services rendered . . . ."  *Id*.  *Toch* supports the argument that if the 2006 Plan Summary Sheet may be considered without reference to the 2006 Incentive Plan document, the facts that there is a definite bonus formula, and no language stating that payment was in management's discretion, support construing the Summary Sheet as a contract between CMA and Shanklin to pay an incentive bonus.  But because there is a dispute as to whether the 2006 Plan Summary Sheet may be considered apart from the 2006 Incentive Plan document, this court cannot conclude as a matter of law that the 2006 Plan Summary Sheet did – or did not – create a contract to pay an incentive bonus.

### 2.  *The Issue of Shanklin's Termination for Cause*

CMA seeks summary judgment that even if the 2006 Plan Summary Sheet is considered without regard to the 2006 Incentive Plan document, Shanklin has no right to receive any bonus payment after his termination for cause.  Shanklin seeks partial summary judgment that his dismissal for cause did not forfeit or otherwise affect his right to bonus payments under the 2005 and 2006 Incentive Plans.

The record makes clear that Shanklin's breach of the GE Policy was the basis for his termination for cause.  The employment offer letter from CMA defined "cause" to include a "material breach of any written policy applicable to employees of the Company."  It is undisputed that Shanklin materially breached the GE Policy.  (Docket Entry No. 30 at 15) (acknowledging Shanklin's violation of the "recordkeeping piece").  It is undisputed that Shanklin was given numerous reminders about the GE Policy and instructions on compliance.  It is undisputed that Shanklin was given several opportunities to comply but did not.  Shanklin was terminated the day after what was described as an important meeting about his failure to comply with the Policy. He attended that meeting without attempting to fulfill his recordkeeping obligations.  At that meeting, he demonstrated a seemingly intractable lack of understanding of the Policy.  He brought a "disorganized" collection of receipts without other documentation and information necessary to comply with the Policy. He left the meeting still questioning whether the Policy recordkeeping obligations needed to be met.  (Docket Entry No. 26, Ex. A-1 at 159:12-160-21, 164:5-8; Ex. A-7 at 147:2-148:20; Ex. A-9).  CMA had legitimate grounds to terminate Shanklin for cause.  CMA told Shanklin that he was fired for materially breaching the GE Policy.  CMA identified Shanklin's failure to comply with internal policy – "Non-Securities Related" – as the basis for his termination in the Form U-5.

Some Texas cases state that entitlement to a posttermination bonus, when it exists, is restricted to cases in which the employee is terminated without cause.  In *Enstar Corp. v. Bass*, 737 S.W.2d 890, 893 (Tex. App.–El Paso 1987, no writ), the court concluded after

reviewing case law that because the bonus agreement at issue was silent as to posttermination payments, "an employee would not earn any bonus for a given year if he voluntarily terminated his employment . . . or was terminated for good cause." The court went on to award posttermination payments because the plaintiffs had been terminated without cause. *Id*. at 894. Several cases that Shanklin cites in support of his entitlement to a posttermination bonus indicate in *dicta* that an employee is not entitled to collect a posttermination incentive bonus if the termination was for cause. Shanklin cites *Kona Tech. Corp. v. Southern Pacific Trans. Co.*, 225 F.3d 595, 605 (5th Cir. 2000) and *Metal Structures Corp. v. Bingham*, 347 S.W.2d 270, 271 (Tex. Civ. App.–Dallas 1961, writ ref'd n.r.e.), in which the courts enforced contracts to pay commissions after the plaintiffs ended their employment. But both these opinions stressed that the result would have been different had the plaintiff been terminated for cause. *See* 347 S.W.2d at 274 ("There is no evidence that appellee was discharged for any valid reason other than appellant wanted to get someone else to do sales work."); 225 F.3d at 605 (stating that its rule applied to "[a]n agent who has not breached the terms of the contract"). Another case Shanklin cites, *Coleman v. Graybar Elec. Co.*, 195 F.2d 374, 377 (5th Cir. 1952), similarly concluded that the plaintiff's right to recover depended on a determination that he was not terminated for cause and remanded the case to the district court for a jury to make that determination.

Other Texas authority holds that termination for cause does not determine whether an employee is entitled to receive a bonus that was earned but not paid when the employment ended. In *Jourdan v. Schenker Int'l, Inc.*, 71 Fed. Appx. 308, 312 (5th Cir. 2003)**,** the Fifth

Circuit reversed a grant of summary judgment for the defendant, concluding that fact issues existed as to whether the plaintiff had a right to receive posttermination commission payments. The plaintiff's employment contract stated that commissions based on gross profits from accounts would be paid on a quarterly basis but did not state whether payments would continue after termination. The plaintiff was terminated for cause. The court concluded that the plaintiff had "raise[d] the reasonable possibility that [her] right to a sales commission accrued, not at the time that the commission was to be calculated, but at the point at which the . . . account showed a gross profit." *Id*. at 312**.** The Fifth Circuit concluded that because the contract was silent as to the effect of job termination, a jury should consider the plaintiff's right to posttermination bonus payments, even if the termination was for cause. 71 Fed. Appx. at 312.[2] The court in *Property Tax Analysts, Inc. v. Jones,* No. 05-93-00390-cv, 1994 WL 24376, at *3 (Tex. App.–Dallas Jun. 27, 1994, writ denied)*, stated that "the terms of the employment agreement and facts of a particular case determine whether an employer must pay the bonus, even if the employer discharged the

---

[2] The Fifth Circuit remanded the *Jourdan* case. After trial, the district court granted the defendant's motion for judgment as a matter of law under Rule 50(b) of the Federal Rules of Civil Procedure. On appeal, the Fifth Circuit upheld the district court's conclusion that there was "no evidence presented at trial that would have allowed a reasonable jury to find that Jourdan's commission" had accrued at the time the account turned a gross profit, rather than at the scheduled time for payment. 275 Fed. Appx. 371, 374 (5th Cir. 2008). The district court credited the testimony of the defendant's vice-president of finance and human resources, who testified that "the Sales Plan commissions were not 'vested benefits,' that commissions were calculated at the end of the fiscal year because gross profits could fluctuate up and down from month to month, and that no salesperson had ever received a commission if they were not currently employed when commissions were paid." *Id.*

employee for cause." *See also Baguer v. Spanish Broad. Sys., Inc.*, 2007 WL 2780390, at **10-11 (S.D.N.Y. Sept. 20, 2007) (court declined to dismiss claim for commission payments despite plaintiff's termination for cause because employment contract setting out commission structure was silent as to whether employees would be eligible to receive commissions in event of termination).[3]

---

[3] There is also authority that an employee's voluntary resignation does not preclude posttermination bonus payments. In *Burkard v. ASCO Co.*, 779 S.W.2d 805, 806 (Tex. 1989), the Texas Supreme Court reversed an appellate court ruling that, as a matter of law, the plaintiff could not collect bonus payments after voluntarily terminating her employment. The employment contract contained a provision entitling the employee to a bonus if she generated a certain level of revenues during the contract term. The contract did not address whether a bonus would be paid if the employee resigned before the contract term ended. *Id*. The court concluded that "[i]n granting [the employee] the right to a bonus, the contract did not condition that right on [the employee's] continued employment for an entire year, nor was [she] ever told that by failing to complete the term of the contract she would forfeit her right to a bonus." *Id*. The Fifth Circuit reached a similar result in *Trask v. Metrocall*, 252 F.3d 1355, 2001 WL 422165, at *2 (5th Cir. Mar. 26, 2001), upholding a jury verdict awarding posttermination bonus payments to a plaintiff who had voluntarily terminated his employment because the incentive "compensation plan, and all of the relevant company literature . . . [did not] prevent an employee from earning commission after termination or resignation." *Id*. Other courts have reached a different conclusion about an employee's entitlement to a posttermination bonus. In *American Medical Enterprises v. Rowley*, 2006 WL 860094, at *4 (Tex. App.–Tyler 2006), for example, the court concluded that the plaintiff, who was terminated for cause, was not entitled to posttermination incentive bonus payments, even though her employment contract stated that she would be entitled to a 3% commission on new business starting on the thirteenth month of the new business contract and continuing "as long as" the new business remained a client of the defendant. *Id*. The court found the contract ambiguous and after considering parol evidence as to its meaning, concluded that "[w]e do not believe that the parties intended, nor do we interpret the phrase to mean, that AME intended to provide a "golden parachute" to Rowley should she leave AME's employment, whether voluntarily or otherwise." *Id*.

Some cases prorate posttermination bonus payments that are not tied to particular sales or other events to the time between the former employee's last bonus payment during employment and the time the employment terminated. In *Fujimoto v. Rio Grande Pickle*, 414 F.2d 648, 653 (5th Cir. 1969), the plaintiffs' bonus agreement provided for an annual bonus equal to ten percent of the company's annual profit, payable at the end of the

In the present case, the 2006 Incentive Plan document stated that generally employees whose employment is terminated before "determination, payment, or receipt of an incentive award" are ineligible for the award. But, as discussed above, there are disputed fact issues material to determining whether this document's terms and conditions apply to the incentive payments at issue. Shanklin's Applicant Acknowledgment Form included a statement that "[i]f my employment is terminated, I will receive only the salary or wages I have already earned for that time I have worked as of the date of termination of my employment, and nothing more." (Docket Entry No. 29, Ex. A-1, exhibit 6). It is unclear whether "salary or

---

company's fiscal year. The plaintiffs voluntarily terminated their employment before the fiscal year ended. The Fifth Circuit noted that "[t]he employment contracts did not in definitive words require that the employees [who quit] complete the fiscal year before their entitlements matured. The contracts did not even specify that the employees were obligated to remain with the company for a full fiscal year." It rejected the defendants' contention that because the ten percent bonus was not computed until the end of the fiscal year, the plaintiffs' right to receive that payment did not accrue until the end of the fiscal year. But the court concluded that the plaintiffs were entitled only to a portion of the bonus, prorated for the months they had actually worked. *Id.* at 653. Similarly, in *Property Tax Analysts, Inc. v. Jones*, 1994 WL 24376, at *3 (Tex. App. –Dallas 1994) (unpublished), the incentive plan provided for a minimum bonus payment of $10,000 payable annually. The incentive plan did not state that an employee had to be employed when the bonus became payable in order to receive it. The court nevertheless concluded that the plaintiff could "recover only a pro rata part of the bonus for the time he actually worked." *Id.* at *4; *see also Haggar Co. v. C.G. Rutkiewicz*, 405 S.W.2d 462, 464-65 (Tex. App. –Waco 1966) ( incentive plan provided for 2.5% share of company's net profits, payable annually; court upheld jury verdict awarding share of annual bonus prorated for plaintiff's five months of employment because employee was not told of policy that employees must remain with company entire year to receive bonus).

wages" included incentive compensation bonus payments.[4]  It is also unclear whether such incentive compensation payments were "earned" during Shanklin's employment – when the accounts funded –  even if the payments were not "determined," paid, or received until after employment ended.  Moreover, there is evidence in the record that CMA's practice was not to enforce the provision in the Applicant Acknowledgment Form as stated.  Employees terminated *without* cause received a lump-sum payout of the incentive bonuses that would have been due on accounts that were funded as of the date of the employee's termination.  Such incentive bonus payments were based on the market value of the accounts at the time of termination.  (Docket Entry No. 23, Ex. 4 at 123:7-20).

The Texas cases make clear that the specific facts of each case must be analyzed to determine whether the employee was informed that termination, including termination for cause, would forfeit any bonus or commission payments that were earned but not paid before the employment ended.  The 2006 Plan Summary Sheet does not state that an employee would forfeit bonus payments for long-term product sales that were funded but not paid when the employee's job terminated.  The 2006 Plan Summary Sheet states that bonuses will be paid "12 quarters from funding quarter" under the specified formula.  The absence of a provision on the effect of job termination, the identification of an accrual date for the bonus payments, and the dispute as to whether the documents CMA made available to Shanklin

---

[4] Section 61.001(7) of the Texas Labor Code defines "wages" as "compensation owed by an employer for labor or services rendered by an employee, whether computed on a time, task, piece, *commission*, or other basis . . . ."  TEX. LAB. CODE ANN. § 61.001(7)(A) (Vernon 2005) (emphasis added).

included language stating that a terminated employee was ineligible to receive a bonus under the 2006 Incentive Plan preclude summary judgment as to whether Shanklin's termination for cause bars recovery of posttermination benefits. Shanklin's motion for partial summary judgment that he was owed such payments is denied. CMA's motion for summary judgment that no such payments are owing is also denied.

   **C.   Shanklin's Right to Receive Bonus Payments under the 2005 Incentive Plan**

   Shanklin asserts that he had two clients with accounts that were "committed" and "may have funded" in 2005. He argues that he might be owed incentive bonus payments on these accounts from 2005. (Docket Entry No. 30 at 8; Ex. 1 at 81:9-21). Records cited by Shanklin, however, indicate that accounts for these clients funded in 2006 and that Shanklin received bonus credit for them. (Docket Entry No. 23 at 6-7, Ex. 4, exhibit 6 at MS0447). These accounts are included in the tally of the seven funded accounts Shanklin identifies for 2006. *Id.* In any event, Shanklin has conceded that any calculated incentive payment in 2005 would have been less than his guaranteed minimum quarterly bonus of $22,500, and that he received the guaranteed minimum. (Docket Entry No. 23 at 4).[5]

_____

   [5] Shanklin also argues that a cash product that he sold to either Boblen or Koch – he cannot remember which and does not specify whether the sale was funded or merely committed – is not reflected in his sales records. (Docket Entry No. 23 at 6-7; Ex. 2 at 70:3-19). In another portion of his deposition, which he does not cite, Shanklin acknowledges that the Boblen cash product was recorded in his sales records, but was misrecorded as a long-term product. (Docket Entry No. 30, Ex. 1 at 81:5-21; Docket Entry No. 23 at 6-7, Ex. 4, exhibit 6 at MS0447). CMA counters that sales information by employees is self-reported (CMA later verifies reported sales with the client) and that if information is missing from sales records, it is because Shanklin failed to report it. (Docket Entry No. 29 at 4; Ex. 2 at 47:15-19). Shanklin has not responded to this argument. In any event, this court notes that

Shanklin is not entitled to bonus payments under the 2005 Incentive Plan.  His motion for partial summary judgment that he was owed such payments is denied.  CMA's motion is granted to the extent it seeks summary judgment that no such payments are owing.

### D.  Shanklin's Right to Incentive Payments for Accounts Committed But Not Funded

Shanklin argues that under the 2006 Plan Summary Sheet, he is entitled to be paid bonuses not only for the accounts that were funded but also the accounts that were committed before his termination.  (Docket Entry No. 23 at 16-21).  He cites the "procuring cause rule," under which "a party may be entitled to commissions on sales made after the termination of a contract if that party procured the sales through its activities prior to termination." *LaScola v. U.S. Sprint Commc'ns*, 946 F.2d 559, 567 (5th Cir. 1991).  Shanklin's argument fails because "the common law procuring cause rule applies "only if the contract does not expressly provide" when an employee becomes entitled to a commission.  *Id*. (refusing to award damages under procuring cause rule for partially complete sales because commission agreement stated that commission would be paid only after sale and installation, and plaintiff had received commissions according to these rules before the job termination).

The 2006 Plan Summary Sheet states that an employee's entitlement to incentive plan payouts for the sales of long-term products begins after the "funding quarter date." (Docket

---

under the terms of the 2006 Plan Summary Sheet, cash product commissions are paid out at 12.5% of revenues over four quarters only (as opposed to 23% of revenues for four quarters, and then 7% of revenues for eight quarters, for long-term products), (Docket Entry No. 26, Ex. A-1, exhibit 5), so Shanklin cannot establish that he was harmed by the fact that the Boblen product was recorded as a long-term product.

Entry No. 26, Ex. A-1, exhibit 5).  Shanklin is not entitled to bonus payments for accounts that were committed but not funded before his job termination.  *See Stewart v. Sanmina Tex. L.P.*, 156 S.W.3d 198, 216 (Tex. App.–Dallas 2005, no pet.) (refusing to award commission for sales pending but not completed at time of employee's termination where "the commission payment plan . . . expressly addressed" time of vesting of commissions and "showed conclusively that Stewart could not receive commissions for sales not made and collected before his termination").

As a matter of law, Shanklin is not entitled to bonus payments on accounts that were committed but not funded before his termination.  His motion for partial summary judgment that he was owed such payments is denied.  CMA's motion is granted to the extent it seeks summary judgment that no such payments are owing.

## III.   The *Quantum Meruit* Claim

Shanklin argues that if this court does not find that the 2006 Plan Summary Sheet is a contract, he is entitled to posttermination incentive bonus payments under *quantum meruit*. Shanklin argues that financial sales people typically are compensated with pay packages that have both salary and bonus components, and that he "expected to be paid the reasonable value of his services in an amount higher than his base salary, depending on his sales performance." (Docket Entry No. 30 at 10).  CMA counters that Shanklin cannot recover on the basis of *quantum meruit* because he had an express employment contract with CMA and an implied contract is unavailable if an express contract is present.  (Docket Entry No. 26 at

17-18) (citing *Allen v. Berrey*, 645 S.W.2d 550, 553 (Tex. App.–San Antonio 1982, writ ref'd

n.r.e.)).

Shanklin's employment was governed by a contract that gave him a base salary of

$135,000 and made him "eligible" for an incentive bonus, "subject to [the] terms and

conditions" of the Incentive Plan "as determined by management." (*Id.*, Ex. A-1, exhibit 2).

Because an express contract addressed the right to compensation, including incentive bonus

payments, Shanklin cannot claim a right to compensation on the basis of *quantum meruit*.

*See Allen*, 645 S.W.2d at 553; *see also Utility Prods. Co., Inc. v. USCO Power Equip. Corp.*,

No. 3-06-cv-1948, 2007 WL 4440946, at *3 (N.D. Tex. Dec. 18, 2007) ("[Plaintiff's]

quantum meruit claim fails because there was an express contract relating to the exact

services that are the subject of this claim.").

CMA is entitled to summary judgment on the *quantum meruit* claim.

## IV.    The Defamation Claim

Shanklin alleges that CMA defamed him when it listed the reason for his employment

termination as "Internal Policy Violation; Non-Securities Related" in the Form U-5 filed with

the NASD. (Docket Entry No. 30 at 16). The parties do not dispute that NASD regulations

required CMA to file the Form U-5 or that CMA was required to provide a reason for the

employment termination on that form. Nor do the parties dispute that employers making

Form U-5 filings enjoy at least a qualified privilege for the statements on the form. (Docket

Entry No. 30 at 16-17; Docket Entry No. 26 at 20-21) (citing *In re Wakefield*, 293 B.R. 372,

385-86 (N.D. Tex. 2003)). Shanklin argues, however, that CMA is not entitled to a qualified

35

privilege because it made the statement on the Form U-5 with "actual malice."  A statement "made with knowledge of its falsity or with reckless disregard as to its truth" is made with actual malice.  *Randall's Food Mkts., Inc. v. Johnson*, 891 S.W.2d 640, 646 (Tex. 1995). Shanklin asserts that CMA used his violation of the GE Policy as a pretext for firing him, and that the real reason was to downsize the institutional sales force.  (Docket Entry No. 30 at 18-20).

Shanklin admits that he violated the GE Policy from its inception in May 2006 until his termination on November 23, 2006.  (Docket Entry No. 30 at 15).  He does not dispute that the GE Policy served important purposes for CMA, including helping CMA to comply with federal and state laws and with NASD supervisory requirements.  (Docket Entry No. 26, Ex. A-6, exhibit 8 at 2; Docket Entry No. 30, Ex. 3 at 38:8-15).  He does not dispute that he received regular reminders and training from the policy's inception until his termination. (Docket Entry No. 26, Ex. A-1, exhibit 12 at MS1326, 1329; Ex. A-5, exhibit 2 at MS 1493-94, MS1505).  He does not dispute that CMA was so concerned about his noncompliance that CMA's Managing Director of Institutional Sales contacted him twice, (*id*., Ex. A-1, exhibit 12 at MS1332), a CMA Business Support Executive engaged him in "a series of conversations," (*id*., Ex. A-7, at 96:12-23, 107:5-109:22), about his noncompliance, and he was summoned to Boston for a special meeting about his noncompliance.  He does not deny that despite having accrued $10,382.97 in reportable expenses at the end of October 2006, he had failed to record *any* by the time he was terminated.  (*Id*., Ex. A-1, exhibit 12 at MS1325; Ex. A-7 at 96:13-23).  He does not dispute that he arrived at the Boston meeting

36

without bringing necessary documentation to comply with the GE Policy.  (*Id.*, Ex. A-7 at 147:19-148:20).  He does not dispute that his employment was terminated the day after the Boston meeting.  Finally, he does not dispute that he was explicitly told that he was being terminated for his failure to comply with GE Policy.  (*Id.*, Ex. A-6 at 127:11-16).

The record does not give rise to a fact issue material to determining whether Shanklin was terminated for an "Internal Policy Violation; Non-Securities Related," as CMA stated on the Form U-5.  (*Id.*, Ex. A-1, exhibit 22).  The statement on the Form U-5 was true, precluding the defamation claim.  *Essex Ins. v. Redtail Prods.*, 213 F.3d 636, 2000 WL 554425, at *2 (5th Cir. Apr. 11, 2000) (citing *Randall's Food Mkts.*, 891 S.W.2d at 646).

CMA is entitled to summary judgment on Shanklin's defamation claim.  Because the defamation claim is dismissed, CMA's motion to exclude the testimony of Shanklin's expert witness, R. Daniel Selak, on the causal relationship between CMA's statements on the Form U-5 and Shanklin's damages, need not be addressed.  CMA's motion to exclude Selak's testimony, (Docket Entry No. 24), is denied as moot.

## V.   Conclusion

Shanklin's motion for partial summary judgment is denied and CMA's motion for summary judgment is granted in part and denied in part.  CMA's motion to exclude Selak's expert testimony is denied as moot.

SIGNED on November 12, 2008, at Houston, Texas.

_____

Lee H. Rosenthal
United States District Judge

37